# The Hazleton Coal Company *versus* The Buck Mountain Coal Company.

57    301
24 SC 497
57    301
31 SC 4 63
57    301
36 SC 480

1. The defendants agreed to build a railroad communicating with the plaintiffs' mines, and to furnish the plaintiffs "the same transportation facilities and charge them the same price per ton for coal as they may or shall at the same time charge for tolls and transportation," &c., between other named points. The plaintiffs in consideration agreed to furnish the defendants all the coal they should mine to the amount of 1,000,000 tons, and not less than 600,000 tons in eight years, and pay to the defendants 2¼ cents per ton till the sum should reach $9000, as security for their covenants. This was a covenant by the defendants to receive and transport all the coal the plaintiffs should mine and offer to them for transportation, not exceeding the contract limit; and to do this in the same manner and with the same diligence they should do for others, but not limited in quantity by the proportion of others: Agnew, J., at Nisi Prius.

2. As to that which is not expressed in a contract but must be implied, such as the time, manner and quantity of coal delivered, the law fixes a reasonable measure of performance which is to be regulated by the usual course of business: *Id.*

3. The plaintiffs while pursuing their mining operations in a reasonable and proper manner were entitled to transportation for all the coal they mined and offered: *Id.*

4. If parties mutually adopt a mode of performing their contract, differing from its strict terms, or if they mutually relax its terms by adopting a loose mode of executing it, neither can go back on the past and insist upon a breach because it was not fulfilled according to the letter. He may require a return to the terms in future: *Id.*

5. As there was no general market of sale for coal at the point of delivery, the measure of damages would be the price of coal in the market of sale, less the expense of putting the coal into market from the point of delivery, and the cost of mining and preparing the coal and transporting it to the point of delivery: *Id.*

6. If the defendants by refusing to furnish transportation, compelled the plaintiffs to desist from mining up to their reasonable production capacity, damages might be allowed for what would be the loss they suffered on the reasonable amount they were in due course mining: *Id.*

7. Proof of a motive to unfairness corroborates the proof of unfairness, and renders it more credible: *Id.*

[Hazleton Coal Co. *v.* Buck Mountain Coal Co.]

8. In mutual contracts one part is not to be abrogated or impaired by another, when that has an appropriate meaning which satisfies the words.

9. Examination and construction of a contract with mutual covenants for furnishing and transporting coal.

February 20th and 21st 1868. Before THOMPSON, C. J., STRONG, AGNEW and SHARSWOOD, JJ. READ, J., at Nisi Prius.

Certificate from Nisi Prius: No. 179, to January Term 1867.

This was an amicable action of covenant in which The Buck Mountain Coal Company were plaintiffs, and The Hazleton Coal Company were defendants. The covenant on which the suit was founded was contained in an agreement between the parties made November 4th 1862, in which the defendants " agree to construct, at their own cost, a good and substantial single-track railroad, with all the necessary switches, turnouts, sidings, &c., for the purposes of a coal road, from the present chutes or stocking ground of the Buck Mountain Coal Company, at or near the town of Clifton, in Carbon county, to the railroad of the said Hazleton Coal Company, and to connect the same with their said railroad at a point near the Beaver Meadow Junction, and to have the said railroad finished and completed not later than the 1st day of June 1863, or as soon thereafter as practicable. The Hazleton Coal Company further agree to furnish the same transportation facilities, and charge them the same price per ton for coal as they may or shall at the same time charge for tolls and transportation of coal per ton from the Lehigh Luzerne Junction to Penn Haven (the distance being about the same, say ten miles).

In consideration, &c., the Buck Mountain Coal Company agree to furnish for transportation over said railroad, all the coal that they may mine, until the quantity furnished shall amount to 1,000,000 tons; and, as a guaranty that not less than 600,000 tons of coal shall be mined and offered for transportation within eight years from the time of the completion of the said railroad, the said Buck Mountain Coal Company agree to pay to the said Hazleton Coal Company $2\frac{1}{4}$ cents per ton on the first 400,000 tons of coal that may or shall be transported over said railroad from Clifton to Penn Haven, for the purpose of creating a fund of $9000: to be held by the Hazleton Coal Company as a collateral security for the furnishing of the said 600,000 tons of coal for transportation within the eight years as before mentioned. It being understood and agreed between the parties, that the Buck Mountain Coal Company shall have a credit or allowance of time for all unavoidable delays or interruptions by which their shipments may or shall be decreased or suspended, so as to prevent them from furnishing for transportation the stipulated quantity of 600,000 tons of coal in the eight years. And if the said Buck Mountain Coal Company fail to furnish the said 600,000 tons of coal for transportation, as before mentioned, the Hazleton Coal

[Hazleton Coal Co. v. Buck Mountain Coal Co.]

Company are to keep and appropriate the said $9000, or so much of it as they may have in hand, and the interest on the same, to their own use, &c. But should the Buck Mountain Coal Company furnish for transportation the 600,000 tons of coal in the time named (with the credit or allowance of time for detentions as stipulated), the Hazleton Coal Company covenant to refund the $9000 with interest, &c.

It being agreed that the Buck Mountain Coal Company will take up all the iron from their present railroad between Rockport and Clifton, previously to the completion of the said railroad to be built by the Hazleton Coal Company; and that the Buck Mountain Coal Company shall construct at their own cost all the necessary chutes, screens and fixtures at Clifton, for the purpose of preparing and loading of coal into cars on the railroad to be built as aforesaid by the Hazleton Coal Company.

The declaration contained five counts; the breach alleged in the first was that the defendants did not construct the railroad on the 1st of June, or as soon thereafter as practicable; in the second, that they did not make the necessary switches, turnouts, sidings, &c.; in the third, that they did not "furnish to the plaintiffs the same means of transportation for said coal, as were furnished by the defendants to other persons sending coal over the road of the defendants from the Lehigh Luzerne Junction to Penn Haven;" in the fourth, that they did not furnish the plaintiffs with the same transportation facilities and at the same rate or price as they did to other shippers of coal, &c. The breach laid in the fifth count was substantially the same as that in the fourth.

At and before the date of the contract, the Hazleton Company owned a railroad from near Hazleton,—where they owned a large body of coal-land,—connecting with the Lehigh Valley Railroad at Penn Haven. About seven miles west from Penn Haven, at Beaver Meadow junction, this railroad connected again with the Lehigh Valley Railroad, and three miles further west it was intersected by the Lehigh Luzerne Railroad. The Hazleton Company's mines, and the Hazleton and Lehigh Luzerne Railroads for many years had been leased to A. Pardee & Co. The Hazleton Company owned no rolling-stock, except 129 coal cars, which also were leased to Pardee & Co., and five old locomotive engines which were not used for transporting coal. There were a number of other companies engaged in transporting coal over the Lehigh Valley Railroad. The defendants appear to have received their stock of cars from the Lehigh Valley Company, and to have distributed them *pro ratâ* to the different companies transporting coal from the Hazleton region.

Before the date of the contract the Buck Mountain Company had transported their coal by their own railroad from their mines to Rockport, on the Lehigh, whence it was shipped by the Lehigh Navigation. Clifton is a point on this road. The great flood of

[Hazleton Coal Co. *v.* Buck Mountain Coal Co.]

1862 destroyed the Lehigh navigation, the only means by which the Buck Mountain Company could reach market.

The plaintiffs entered into the contract in question to furnish an outlet for their coal. The breach principally relied on was, that the defendants did not furnish to the plaintiffs the facilities for transporting their coal which they had covenanted to do. The plaintiffs claimed that the defendants were bound to furnish them *absolutely* a sufficient number of cars to transport the amount of coal agreed to be transported over the defendants' road. The defendants alleged that they were bound to furnish cars only *pro ratâ* with other companies using their roads, to be measured by the amount of coal produced from the respective mines.

On the trial the plaintiffs offered to prove the profits per ton on coal in 1863, 1864 and 1865, for the purpose of damages, and as bearing on the question of the motives of the agents of this company in violating the contract; to be followed by proof that defendants leased the road. This was objected to by the defendants, admitted by the court, and a bill of exceptions sealed.

The testimony was very voluminous, but what is above stated, and the portion of the charge of the court given below, will sufficiently exhibit the questions involved.

Judge Agnew charged :—

"We have now reached the disputed clause—the same transportation facilities; the defendants alleging this to mean the same *proportional* facilities they furnish to other collieries. Let us suppose the writing to be under consideration before it is yet signed, and to be read down to this clause. The plaintiffs stop the reading and inquire—what do you mean by the same transportation facilities? You do not state what they are. The tolls and charges we understand. They are to be the same as you charge others from the junction to Penn Haven; but what are the transportation facilities you refer to as the same which you are to furnish us? Suppose the defendants reply—well, they are to be in the same proportion to the whole of our rolling-stock, as the productive capacity of your mines bears to the aggregate production of all the mines sending coal over our road. The answer to this would have been immediate :—That will not do—it is inconsistent with our mutual undertakings. You have bound us to mine and offer for transportation on your road not less than 600,000 tons in eight years, which will average 75,000 tons a year; now, if your transportation stock is insufficient for the whole trade, our proportion may not enable us to offer, or you to receive for transportation, the number of tons you have bound us to furnish, and you will thus deprive us of the $9000 we stipulate to put in your hands as a security that we will furnish you that quantity. The percentage of cars thus apportioned to us might not be sufficient to carry off more than 50,000 or 60,000 tons per annum.

[Hazleton Coal Co. v. Buck Mountain Coal Co.]

We cannot conduct our mining operations profitably in this way. With such a reading of the terms—"same transportation facilities"—the parties must have stopped. The restriction was not only at variance with the profitable mining of the plaintiffs, if the proportion of cars should fall far short of their wants, but would also diminish the tolls over the new road representing so much capital expended in its construction. It collides directly with the understanding of the defendants to furnish the plaintiffs transportation for *all the coal mined and offered,* and with the plaintiffs' obligation to furnish a certain quantity in a given time. This cannot be the true sense of the language used.

"But if the defendants had said, in answer to the question, what facilities do you mean? we mean that we will furnish the same kind we do to others coming from the Junction to Penn Haven—that is, as good cars, that will hold as much, and take them to you, and bring them away with the same diligence that we serve them—the agreement would then have been signed at once. This is the true meaning of the contract, as drawn from the words of the special clause; not by cutting out a word or by rejecting the whole clause, but by interpreting it with the context, and the intention of the parties gathered from the four corners of the instrument. The defendants agreed to receive and transport all the coal the plaintiffs should mine and offer to them for transportation, not exceeding the contract limit; and to do this in the same manner and with the same diligence they should do for others, but not limited in quantity by the proportion of others. The time and manner of doing this, of course, was subject to the usual and ordinary course of mining operations. As to that which is not expressed in a contract, but must be implied, such as the time, manner and quantity of coal delivered, the law fixes a reasonable measure of performance, and that it is regulated by the usual course of the business. The plaintiffs could not, by crowding and driving their mines, accumulate an extraordinary stock, and demand an immediate transportation. Nor could the defendants push over the transportation into particular seasons to accommodate themselves, or the bulk of the 600,000 tons to the latter part of the period of eight years.

"But the plaintiffs, while pursuing their mining operations in a reasonable and proper manner, were entitled to transportation for all the coal they mined and offered.

"The only doubt I have had upon this clause in the contract has arisen from the constant practice of the defendants, through Pardee & Co., to regulate the transportation by a *pro ratâ* distribution to all the mines. But this is removed by several considerations. First, there is no evidence that the defendants are under the contract duties to others. As to other collieries, therefore, they must adapt their regulations to their legal duty to them. As

7 P. F. SMITH—20

[Hazleton Coal Co. *v.* Buck Mountain Coal Co.]

to them, it was proper to make a *pro ratâ* distribution, according to their tonnage. No fault, therefore, could be found with the adoption of this general rule. But to apply the rule to the plaintiffs is to take them out of their contract relation, and impinge upon its terms, which are at variance with such a rule of distribution. In the next place, there is no evidence of any express agreement to vary the contract and to adopt the *pro ratâ* mode of distribution. And, finally, there is the evidence of dissatisfaction existing about the amount of transportation furnished. I do not see, therefore, how the mode of distributing the cars can be made to bear successfully on the interpretation of the agreement. How the contract was actually executed between the parties, or whether the *pro ratâ* mode of distribution was accepted, by the plaintiffs is a different question—to be left to the jury on the evidence.

" Three breaches of the contract have been assigned :—

" 1. For not building the road in time.

" 2. For not making sufficient sidings.

" 3. For not furnishing sufficient transportation facilities.

" The contract required the railroad to be finished and completed not later than the 1st of June 1863, or as soon thereafter as practicable. If difficulties arose from the state of the weather, or the condition of the ground, or other unavoidable causes, the defendants had a reasonable practicable time to finish after the first day of June. Was the work retarded until after the first day of June by unavoidable causes? If so, did the defendants finish in a reasonably practicable time after that day? If not, the plaintiffs would be entitled to recover such reasonable damage, arising directly from the delay, as the jury may find upon the evidence.

" The next breach is as to the sidings. The jury will determine whether there was any breach of this part of the agreement, and if they find it, allow the damages shown by the plaintiffs to have resulted to them directly from the injury.

" The 3d breach is the important one, and is the real ground of controversy. The jury, taking the interpretation of the agreement from the court, will, therefore, inquire and determine from the evidence whether the plaintiffs, in the usual course of mining, mined and offered to the defendants or their agents for transportation, in reasonable quantities and at reasonable times, coal which the defendants did not or would not transport from their mines to Penn Haven. In considering this question the jury are instructed that the defendants were bound to transport all the coal offered to them for transportation by the plaintiffs in this reasonable manner, and could not confine them to a *pro ratâ* distribution of cars, in a proportion founded on the average production of other collieries using the road, unless the plaintiffs consented so to receive it.

[Hazleton Coal Co. *v.* Buck Mountain Coal Co.]

" Under the contract, the coal was to be furnished at the mines and transported thence. For this purpose the defendants were to build the tracks, sidings, &c., while the plaintiffs were to erect the machinery, &c., for loading into the cars. The evidence shows that the loading is done at the breaker, and if the cars are not sent there to take away the coal, the breaker, baskets, &c., fill up, mining cars cease coming, and finally the mines are blocked up. It was the duty of the defendants to send a sufficient number of cars when they were informed that they were needed at the mines, and not for the plaintiffs to carry the coal to them. If, therefore, the plaintiffs had coal mined lying at their mines, and demanded cars for its transportation, which the defendants failed or refused to furnish, this would be a sufficient offer under the contract.

" There is no evidence, that I remember, of any specific offer at a particular time of a given amount of coal for transportation, and a refusal by the defendants thereupon to transport such amount. But there is evidence, consisting of facts and circumstances, tending, as it is alleged, to prove that the plaintiffs had coal mined and ready for transportation, and made requests for transportation of the defendants, and that defendants declined to furnish it beyond a given percentage of cars fixed by them as the only number they would furnish. The plaintiffs gave evidence to show to the jury, who must judge of it, that their mines became blocked up, and that their works stopped from time to time from a want of cars; that they kept a book of stoppage for this reason, made out a statement of lost time, and presented a bill for it to the defendants—that the loaded tracks were sometimes full—that they needed 75 to 80 cars a day, but frequently got only 20, 30, 40, 50 and 60 cars a day; that the mines were not worked up to their capacity, from a want of cars; that there were not cars enough on the whole road to do all the business of the various collieries; that the defendants fixed the plaintiffs' transportation—not by the product of their mines, but by a *pro ratâ* founded on the whole business of the road; that this *pro ratâ* was reduced from time to time, and especially on account of the opening of new mines by other parties; that complaints were made by plaintiffs to defendants and their agents, both verbally and in writing, and requests made for transportation, and no response except that they had their just *pro ratâ*. Opposed to these allegations, and contradicting the idea that the plaintiffs were mining and offering their coal upon the basis of a strict performance of the transportation clause of the agreement and according to its letter, is all the evidence which tends to show, as the defendants allege, that the plaintiffs acquiesced in the mode of distributing the cars by a *pro ratâ* percentage. It is alleged that both the written and oral evidence of the plaintiffs—of com-

[Hazleton Coal Co. *v.* Buck Mountain Coal Co.]

plaints of insufficient transportation—was confined to these complaints; that the *pro ratâ* was not assigned upon a proper basis of measurement of the several mines and a correct calculation of the percentage, and that Connor, the distributing agent, was partial and unfair in his distribution. It is alleged that the evidence does not show any complaint that sufficient transportation was not furnished for all the coal mined and offered by the plaintiffs, but that it shows that plaintiffs did not exact a strict and literal performance, and in its execution adopted the mode of performance practised by the defendants.

"The jury will take the evidence altogether and look on both sides, and from the whole determine what mode of performance the plaintiffs offered, and what mode they accepted. If the parties mutually adopt a mode of performing their contract, differing from its strict terms—as if by a contract wheat is to be weighed, and it is accepted by measurement—or, if they mutually relax its terms by adopting a loose mode of executing it, neither party can go back upon the past and insist upon a breach, because it was not fulfilled according to its letter. He may insist upon a different mode of observing it in the future, and require a return to the terms of the contract. This is the doctrine of Forsyth & Brothers *v.* North American Oil Co., 3 P. F. Smith 168, and, no doubt, of other cases to be found in the books. Parties often have good reasons for deviation or relaxation, and it would be most inequitable, if, understanding each other, one, after leading the other to rely upon his having performed his contract duty, should fall back upon him for damages for non-fulfilment according to the letter.

"If, in this case, the plaintiffs accepted the *pro ratâ* mode of distributing the cars as the measure of performance, and accepted the number thus assigned them from time to time, and if their complaints were not of the mode of ascertaining the number allotted to them, but because it was not made upon what they believed to be a proper basis of measurement of the mines, or made upon an incorrect calculation of the tonnage, or because of a supposed unfairness in the agent distributing them, they cannot now turn back and complain of the *pro ratâ* mode adopted. If, on the whole evidence, the jury believe that the plaintiffs in fact got their fair proportion of cars under the mode of distributing them, it is too late to say it was not a literal compliance with the contract. If the jury should find that the defendants failed to transport the coal offered to them under the contract, the damages would be the loss the plaintiffs suffered on the coal thus ready and offered for transportation. This loss would be the difference between the cost of mining, preparing and transporting the coal to Penn Haven and the price it would have brought there. This is the direct and immediate consequence of the defendants' breach

[Hazleton Coal Co. *v.* Buck Mountain Coal Co.]

of their contract. The defendants had the exclusive control of the transportation. The plaintiffs had no other route to Penn Haven to avail themselves of, and to reduce the loss to the difference in cost of transportation. The plaintiffs being confined to this route, and yet denied it by the defendants' refusal to transport, the direct loss is the difference between the cost of the coal at Penn Haven and the price it would bring there, or, in other words, the profits. I say Penn Haven, because it is the terminus of the Hazleton road, and of the shipment under the contract. But the jury will remember, and no doubt be satisfied on the evidence, that the actual shipments did not end there—the coal being carried by mining arrangements with other roads to markets further off, and there was probably no general market for the sale of coal at Penn Haven. The jury would, therefore, have a right to take the price of the coal in the market of sale and to deduct from this the cost of transportation from Penn Haven, and expense of putting the coal in the market, in order to find a fair price at Penn Haven, and from this deduct the cost of mining and preparing the coal and of transporting it to Penn Haven. But beside the coal actually mined and ready for transportation, if the defendants refused to furnish sufficient transportation, and thereby compelled the plaintiffs to desist from mining up to their reasonable productive capacity, this would be an injury for which damages may be allowed. If, by the defendants' breach of their contract and failure to furnish the necessary transportation, the plaintiffs became unable to mine, because of the blocking up of their mines, so that the production must cease from a want of cars to take it away, the defendants cannot set up the consequences of their own breach as a defence, and resist a recovery, because the coal could not be mined and offered to them. The injury of the plaintiffs would be the loss they suffered on the reasonable amount of coal they were, in due course of mining, able, ready and willing to mine and offer for transportation, had they not been prevented by the defendants' act from doing so. To the extent of this breach of the defendants in failing to furnish cars beyond the number they did furnish, if so found by the jury, the plaintiffs would be entitled to a fair and reasonable sum in damages—what the jury can properly find, on all the evidence, as a compensation for the reasonable amount of coal they were thus prevented from mining.

"Evidence was received as to the relation of Pardee & Co., the lessees of the road, and the motives of themselves and their agents to make an unfair distribution of the rolling-stock. The competency of this evidence was reserved. I now say to you that it is competent in my judgment. The defendants disabled themselves from executing their contract with the plaintiffs, directly or personally, by putting their road wholly into the pos-

session and control, as to transportation, of Pardee & Co. They also leased to them their mines. By the act of the defendants, Pardee & Co. became sole instruments of carrying into effect this contract with the plaintiffs, and yet were also made by the lease competitors for transportation. There was a direct interest in the control of the transportation adverse to that of the plaintiffs. In controlling that transportation, the proof tends to show that Pardee & Co. exercised it by a percentage of distribution not founded on the contract right of the plaintiffs, but on a supposed equality of proportion belonging to all the mines, and that this proportion was varied from time to time, sometimes reducing the plaintiffs' *pro ratâ* to suit the alleged general demand for facilities. Now, the proof of a motive to unfairness corroborates the proof of unfairness, and renders it more credible. If to the proof offered to establish unfairness and inequality of distribution, you add a selfish motive to carry the cars to the mines of Pardee & Co., it certainly strengthens the credit to be given to the former.

"But while I thus instruct you upon the legal competency of such evidence, I am far from saying, as a question of fact, that my mind is satisfied that Pardee & Co. were actually influenced by these selfish considerations to act unfairly. On the contrary, the evidence impresses me favorably toward them, that they endeavored to act impartially, but that their error consisted in an erroneous construction of the contract, leading them to apply to the plaintiffs a general and equitable rule of distribution, but one not consistent with the rights of the plaintiffs under their contract.

"I have now given to the jury the necessary legal instruction. I have not referred to the evidence specifically, preferring to let the jury decide for themselves. In order to enable the jury to make a proper application of the facts, it was necessary to state those that are relied on to prove the breach of contract; but whether these facts are established in the proof, and whether, if fully proved, they justify the conclusions drawn from them, are matters for the jury, whose province it is to determine the facts and draw the proper conclusions under the legal instructions given. The jury will now take the case and decide it.

"The evidence that Mr. Jenks said if the defendants would furnish him transportation to comply with certain contracts, he would forgive the past, depends on how the jury shall find the facts. If it was intended as a contract which the plaintiffs authorized Mr. Jenks to make, in consideration of some advantage which plaintiffs would gain by the arrangement, and which the defendants assented to, to procure a settlement of their past difficulties, it would be a contract, and operate as a release. But if it was no more than the expression of the feelings or disposition of Mr. Jenks, it would not be a contract. And the jury should con-

[Hazleton Coal Co. v. Buck Mountain Coal Co.]

sider whether any new consideration arose, or whether the plaintiffs gained any more than their contract rights. The facts must evidence a contract, otherwise they go like other facts in the cause in relation to the conduct of the parties in carrying out the agreement."

The verdict was for the plaintiffs for $39,388.

The defendants took a writ of error, and assigned for error the admission of the evidence mentioned in the bill of exceptions and the charge, in a number of specifications.

*F. B. Gowen* and *F. Sheppard*, for plaintiffs in error.—No implied covenant to furnish cars can be drawn from the contract: Platt on Covenants 40, 45; Noke's Case, 4 Rep. 80; Line v. Stephenson, 4 Bing. N. C. 678; Kent v. Welch, 7 Johns. R. 258; Vanderkom v. Vanderkom, 11 Id. 122; Weems v. McCaughan, 7 S. & M. 422; Morris v. Harris, 9 Gill. 19. It is the legal duty of a railroad to treat all its customers alike: Nicholson v. The Great Western Railway Co., 5 C. B. N. S. 366; Oxlade v. The North Eastern Railway Co., 1 Id. 454. If the terms of a contract are ambiguous, the usage of the parties becomes an important element in its construction: Coleman v. Grubb, 11 Harris 393; Lehigh Coal and Navigation Co. v. Harlan, 3 Casey 430. As to the measure of damages: O'Connor v. Forster, 10 Watts 418; Brackert v. McNair, 14 Johns 170; Lentz v. Choteau, 6 Wright 435; McKnight v. Ratcliff, 8 Id. 156; Brown v. Foster, 1 P. F. Smith 165; Fleming v. Beck, 12 Wright 309. The time for which the contract was to run had not expired, and the action is prematurely brought: 2 Pars. on Cont. 517.

*R. C. McMurtrie* and *C. Guillou*, for defendants in error.— There is no express covenant to override the implied agreement to furnish cars: Woolley v. Reddelien, 5 M. & Gr. 316; Wood v. Copper Miners, 7 C. B. 906; Pilbrow v. Pilbrow, 5 Id. 440. Extraneous facts may be looked at to ascertain whether there was an implied covenant to carry: Simpson v. Margaritson, 11 Q. B. 32; Turner v. Evans, 2 E. & B. 516; Elliott v. Turner, 2 C. B. 446; Osborne v. Wise, 7 C. & P. 761; Bainbridge v. Wade, 16 Q. B. 98; Snyder v. Leibengood, 4 Barr 305; Wigram on Ev. 83. A contract is not to be construed by the usage of the parties: Coleman v. Grubb, 11 Harris 394; Lehigh Co. v. Harlan, 3 Casey 439. A breach of the covenant has already occurred: Emmens v. Elderton, 13 C. B. 495; Campbell v. Gates, 10 Barr 483; Clarks v. Marsiglia, 2 Denio 317; Wilson v. Martin, Id. 602; Lush v. Russell, 4 Exch. 637; Goodman v. Pocock, 15 Ad. & E. (N. S.) 576.

The opinion of the court was delivered, May 7th 1868, by

[Hazleton Coal Co. *v.* Buck Mountain Coal Co.]

AGNEW, J.—The true interpretation of the transportation clause in the contract between these parties, is the only important question in this case. It alone was argued and relied upon, and its decision is all that is required. The agreement was executed on the 4th of November 1862; but the transportation part of it was not to take effect until June 1863, when the road was to be finished. The substitution of A. Pardee & Co., in the mean time, on the 24th of December 1862, as lessees both of the mines and the transportation, whose interests would conflict with those of the plaintiffs, was the exercise of a power bearing on the question of interpretation. The leading features of the contract, on part of the plaintiffs, are these. They agreed to build the fixtures, to prepare and load their coal into the cars on the defendants' railroad, " to furnish for transportation all the coal they may mine until the quantity furnished shall amount to one million of tons," " of which quantity not less than 600,000 tons shall be mined and offered for transportation within eight years from the time of the completion of the said railroad." As a collateral security for the furnishing of the said 600,000 tons for transportation, by the Buck Mountain Coal Company, within the eight years as before mentioned," they were to pay into the hands of the defendants a certain rate per ton, amounting to $9000, which the defendants were to "keep and appropriate," "if the said Buck Mountain Coal Company fail to furnish the said 600,000 tons of coal for transportation, as · before mentioned." As a further security, the plaintiffs were " to take up all the iron from their old or present railroad between Rockport and Clifton, previous to the completion of the said railroad." Now on these covenants, no one can doubt that the plaintiffs were bound to furnish to the defendants, for transportation, not less than 600,000 tons of coal in eight years, and had the right to furnish as much more as would make one million of tons. But this must be done according to the legal effect of the covenant, to wit, in the usual and ordinary course of mining operations. The plaintiffs being thus bound, the correlative duty of the defendants to transport the coal is not to be doubted, and, indeed, is conceded. Now this duty can be overcome only by a plain and express covenant which limits or qualifies it. Where, in this agreement, do we find any plainly and fairly expressed covenant which limits the duty to transport the coal thus mined and offered, and substitutes for it a *pro ratâ* or percentage of transportation in the proportion that the product of the plaintiffs' mines bears to the product of all the mines of that region sending coal over the defendants' road? That no such express covenant as this can be found in the agreement is beyond dispute. Neither the number of cars nor the idea of proportion is expressed anywhere in the writing. If it exists at all it must be found only in the following covenant:

[Hazleton Coal Co. *v.* Buck Mountain Coal Co.]

" The Hazelton Coal Company further agree to furnish the same transportation facilities, and charge them the same prices per ton for coal as they may or shall at the same time charge for tolls and transportation from the Lehigh Luzerne Junction to Penn Haven (the distance being about the same, say 10 miles)." What does this language fairly import? What will fully and fairly satisfy the meaning of the words? Now, it is a cardinal rule of the interpretation of mutual contracts, that you are not to abrogate or impair one part of a contract by another, when that other has an appropriate meaning which fully satisfies the words. To understand this covenant, we must remember that the branch road runs from the main stem to Clifton, and that the Lehigh Luzerne Junction lies west of the branch about as far as Clifton lies from the main road, while all of the other collieries lie beyond the junction. Now everything in the interpretation of this covenant rests upon the word " same." The same as what? The same transportation facilities and the same charge for tolls and transportation between Clifton and Penn Haven, as between the Lehigh Luzerne Junction and Penn Haven. Why? The agreement answers. The distance being about the same, say 10 miles. Clifton was omitted to be named, but the reference to the distance plainly supposes it as the object of comparison. The reason was obvious; Clifton being about the same distance from Penn Haven as the junction, the junction was fixed upon as the measure of the rights of the plaintiffs under the covenant. The plaintiffs were therefore to have the same transportation facilities from Clifton to Penn Haven as the company used from the junction to Penn Haven. The cars were to run as often and as regularly from Clifton to Penn Haven as from the junction to Penn Haven. They shall be as timely to bring away and take back cars. The cars shall be as capacious and as serviceable; there shall be the same kind of cars, canal and railroad. In short, the branch road to Clifton shall have the same transportation facilities as exist on the main road to the junction, and the same charges for tolls and transportation.

Now here is a plain and clear meaning consistent with the words of the covenant, filling them completely without impairing the duty arising out of the other part of the contract. The agreement does not undertake to regulate the number of the cars for the plain reason that the number was indefinable, being dependent on the quantity of coal to be mined in the usual course of operations, between the minimum and maximum fixed in the contract. But suppose we extend the meaning of the word " same" so that it shall compare persons instead of places, and the covenant shall read, " the same number of cars as we furnish any other party between the junction and Penn Haven," what is gained? According to every correct rule of interpretation of the covenant in favor

[Hazleton Coal Co. *v.* Buck Mountain Coal Co.]

of the covenantee, this would give the plaintiffs the highest number of cars furnished to any other party, to wit, twenty-nine cars where they got but eleven, and twenty-five where they got but seven. In order to get below the highest number given to any other party, you must extend the meaning of "same" still further, so as to introduce into it also the idea of proportion. But the idea of such a proportion is to be found nowhere in the contract, expressly or impliedly, and is both impracticable and unfair, as I shall now show.

A *pro ratâ* is founded upon the productive capacity of all the mines of that region dependent on this road. This is to be ascertained either by measurement, or by actual results. Two weeks were spent in the endeavor to prove both, and with no satisfactory result. The number of slopes, gangways and breasts of a colliery being given, no certainty follows, for still its product depends upon the pitch of the vein, its thickness, hardness, intervals of slate and faults. Owing to these circumstances, the proof was that the daily product of a miner will vary from four to fifteen and even twenty tons. Then the hoisting power is often not in proportion to the productive capacity of the mine. One witness testified that in a given time in his mine six hundred mine cars could be sent from the breasts to the bottom of the slope, while the hoisting power could raise but three hundred in the same time. Then follows the hauling to the breaker, involving the elements of distance, inclination and power. After this the capacity of the breaker, pockets and chutes. Disproportions exist in every colliery, which must all be taken into account for actual measurement. Then come the length of the siding, and the standing room for the cars. The effect of this is thus illustrated. We were blocked up (said a witness) with loaded cars when the engine did not come regularly. When the pockets were full we would lie idle. The men would not go into the mines for less than half a day's work. Lost one day out of three from a want of cars and by being blocked up with full cars. The end is not yet; now come the deductions for unavoidable delays and interruptions incident to mining operations, such as accidents to the mines and machinery, and the refusal of the miners to work, caused by funerals, holidays and strikes. The testimony of Calvin Pardee on this point was that he counted forty weeks as a year's work. It is to these delays and interruptions the covenant applied to allow the plaintiffs credit for time lost out of the eight years in which the 600,000 tons of coal were to be furnished. It was not to the failure of the defendants to furnish transportation. That itself was a sufficient excuse, but the covenant for credits was for the benefit of the plaintiffs to prevent injury by these delays. When we consider these discordant elements, it will be seen that measurements of all the mines for a *pro ratâ* is practically a delusion. An attempt was made

[Hazleton Coal Co. *v.* Buck Mountain Coal Co.]

at one time at what were termed trials to ascertain the productive capacities of the mines, by giving them all the cars that could be furnished for a given space of time, but it proved abortive. The next resort was to actual shipments as shown by a table. But this was, if anything, more unsatisfactory, for the shipments depended on the *pro ratâ* of cars supplied, of which every colliery complained. Markle, a brother-in-law of Pardee, who regulated the transportation, says, I don't think two days passed without complaining, till I got tired of it. I don't think an operator in the region complained with more bitter feeling, for I felt we were wronged. The effect of the *pro ratâ*, when a sufficient number of cars was not supplied, was this, the breakers and pockets filled, the hoisting ceased at the slopes, the mine cars ceased to run, and the miners had to stop. The mines could not ship the coal they were able to produce, and hence a *pro ratâ* founded on shipments was esteemed unfair. Of course if the plaintiffs bound themselves to accept a *pro ratâ* they cannot complain; but this is the very question, did they bind themselves to such a rule. Now in performing the mere legal duty to the public a *pro ratâ* founded upon any reasonable data would be sufficient to justify the defendants in distributing their cars according to such a *pro ratâ*. But here the question arises upon a contract, and the question is whether it is reasonable to suppose the plaintiffs, having bound themselves to perform their covenants for a specific quantity of coal under a penalty, agreed to commit themselves to a *pro ratâ* dependent upon the will of the opposite party, and that party a rival in the same trade. It is also unreasonable in another aspect; in subjecting the plaintiffs to a sliding scale constantly tending downward. This is proved by a *pro ratâ* table from August 5th 1863, to October 29th 1866. Thus the *pro ratâ* or percentage of the plaintiffs ran down from 11 to 7 per cent., while the defendants' collieries ran down from 29 to only 25 per cent. East Sugar Loaf ran up from 14½ to 15 per cent.; Harleigh from 5½ to 6; Zeddo 14¼ to 16; Ebervale 5½ to 9, and Milnesville 4½ to 6. The idea of proportion not being found in the writing, it is, therefore, unjust to give to the word "same" this extended interpretation, when the word is fully satisfied by a proper and wholesome meaning not destructive of the duty cast upon the defendants by their contract. It submits the plaintiffs to the discretion of the defendants, it has no adequate means of ascertainment, it is a shifting rule, it diminishes the plaintiffs' demands as certainly as new collieries are opened and others increased. It is not interpretation but addition to the writing to give it this meaning.

But it is argued that to give the plaintiffs more than a *pro ratâ* is illegal. This was answered by saying that the charter of the defendants was not compulsory. I think there is another answer. It is not unfair and therefore not illegal. The road to Clifton is

[Hazleton Coal Co. *v.* Buck Mountain Coal Co.]

a new road, a branch. The right of the defendants to build it is not denied, while the terms of the contract to effect its construction belong to their own discretion. The purpose was beneficial to the covenantor and to themselves and warranted their covenant to furnish the necessary transportation upon it. If they had no right to divert any of the rolling-stock then on the road beyond the junction, they were bound to add to their stock a number sufficient to stock the branch. If they could divert to it no more than a *pro ratâ*, they had a right to add still to this number so many as would make up the number required for this branch, and to appropriate to it exclusively this additional number. They were not bound to a *pro ratâ* over the whole road, founded upon the number thus added to the branch. The mixing of the cars is immaterial, as it is not the identity of the cars added to the branch, but the number sent there, which is the important matter. If the others still got their former *pro ratâ* they could not interfere with the number-added to the branch, a new work.

As to the alleged interpretation of the contract by the plaintiffs, it is sufficient to say that the question of fact was distinctly and fairly submitted to the jury on the whole evidence, and the plaintiffs' right to a verdict made to turn on this fact. The jury found against it, and there was no motion for a new trial. The fact thus silenced by the verdict cannot now be permitted to speak for this alleged interpretation by the acts of the plaintiffs.

The judgment is therefore affirmed.